### In re STEWART et al. (two cases).

(Supreme Court, Appellate Division, First Department. December 31, 1897.)

1. ELECTIONS—TRANSCRIBING TALLY SHEET.
　　Under the present election law (Laws 1896, c. 909), after the tally sheet, filled in by the poll clerk as the votes are counted, has been verified, the duty of the inspectors to transcribe therefrom, upon the official statement of the vote, the totals as they appear in the tally sheet, is purely ministerial, involving no discretion, and no other source exists from which the statement can be made.

2. SAME—ERRORS IN STATEMENT—CORRECTION—MANDAMUS.
　　When it appears before the board of county canvassers that the original and certified copy of the statements submitted by the inspectors of election certifies to a different number of votes from that contained in the tally sheet, it is their duty, under section 132 of the election law, relating to the correction of clerical mistakes, to require the attendance of the inspectors for the correction of such mistake, and the duty of the inspectors, upon assembling, to forthwith make such corrections; and the performance of these duties may be compelled by mandamus.

3. SAME.
　　In such a proceeding it was alleged upon oath that the official statement made by the inspectors did not correspond with the public record of the votes, as contained in the tally sheet. The only answer of the inspectors was that, if any such discrepancy existed, the error was not in the statement, but in the tally sheet. *Held*, that this constituted no dispute of the material fact of a failure to make a statement containing the result of the canvass as shown upon the tally sheet, and hence raised no obstacle to relief under a peremptory writ of mandamus.
　　Van Brunt, P. J., dissenting.

Appeal from special term.

In the matter of the application of Perez M. Stewart and Howard P. Okie for a writ of mandamus to the board of county and city canvassers of the city and county of New York (proceeding No. 1). In the matter of the application of the same parties for a writ of mandamus against the inspectors of election of the Seventh, Eighth, Tenth, Fourteenth, Seventeenth, Eighteenth, Nineteenth, and Twentieth election districts of the Nineteenth assembly district of the city and county of

New York (proceeding No. 2). From an order entered in each of the above proceedings denying the motion for mandamus, the petitioners appeal. Reversed.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, O'BRIEN, and INGRAHAM, JJ.

Horace E. Deming, for appellants.
Asa Bird Gardiner, for respondents.

INGRAHAM, J. In the proceeding designated as "No. 1," petitions were presented to the supreme court asking that the board of county and city canvassers of the city and county of New York be required to summon the several boards of inspectors of the Seventh, Eighth, Tenth, Fourteenth, Seventeenth, Eighteenth, Nineteenth, and Twentieth election districts of the Nineteenth assembly district to appear before the board of city and county canvassers, to make such corrections in the original statements of the votes polled as the facts of the case required, and to cause their canvass of the votes in said several election districts to be correctly stated. In the proceeding designated "No. 2," petitions were presented asking that the inspectors of the several election districts before referred to be required to reconvene, and that the said inspectors thereupon make a correct statement and return of the canvass of votes in their said election districts from the tally sheets kept by the poll clerks, in accordance with section 84 of the election law, of the votes for member of assembly and member of the board of aldermen in said assembly district, and that the board of county and city canvassers of the city and county of New York canvass from such statement and return the votes for said offices in said election district at said election. These applications were denied, and, from the order entered upon such applications, the petitioners appeal.

The questions presented on both applications are based upon substantially the same facts. The relief asked in the proceeding first specified is to require the board of city and county canvassers to require the inspectors of election to appear before them to correct the clerical mistakes that appear upon the face of the returns; and, in the second, to require the inspectors, upon such appearance before the board of city and county canvassers, to make the original statement of the votes, made as required by section 111 of the election law, conform to the tally sheet kept by the election officers in pursuance of section 84 of the election law; and the questions presented upon these two applications, involving, as they do, a construction of the election law, and as to what relief, if any, the petitioners were entitled to, may properly be discussed together. The facts are substantially undisputed. It appears that at the general election held on November 2, 1897, the petitioner Perez M. Stewart was a candidate for the office of member of assembly, and that the petitioner Howard P. Okie was a candidate for the office of member of the board of aldermen from the Nineteenth assembly district; that Solomon C. Weill was a candidate for the office of member of assembly, and John S. Geagan was a candidate for the office of member of the board of aldermen.

On the tally sheets kept by the election officers, as prescribed
by the election law, it appeared that in the Seventh election district
of the Nineteenth assembly district Perez M. Stewart received for
the office of member of assembly 50 votes, in the Eighth election dis-
trict 100 votes, in the Fourteenth election district 128 votes, in the
Seventeenth election district 47 votes, in the Eighteenth election
district 85 votes, in the Nineteenth election district 133 votes, and in
the Twentieth election district 156 votes. It further appears by
said tally sheet that Solomon C. Weill, the Democratic candidate for
the office of member of assembly, received in the Tenth election dis-
trict of the said assembly district 135 votes, in the Nineteenth election
district 69 votes, and in the Twentieth election district 86 votes. In
the official statement of the votes for the office of member of assembly,
signed by the inspectors of election, it appeared that the vote for
Stewart in the Seventh election district was 46 votes instead of 50
votes, as appeared by the tally sheet; in the Eighth election district
12 votes instead of 100 votes, as appeared by said tally sheet; in the
Fourteenth election district 112 votes, instead of 128 votes, as ap-
peared by said tally sheet; in the Seventeenth election district 42
votes, instead of 47, as appeared by said tally sheet; in the Eighteenth
election district 30 votes instead of 85 votes, as appeared by said tally
sheet; in the Nineteenth election district 130 votes instead of 133
votes, as appeared by said tally sheet; and in the Twentieth election
district 151 votes instead of 156, as appeared by said tally sheet.
And it appeared that the said Solomon C. Weill received in the Tenth
election district 151 votes instead of 135, as appeared by the said
tally sheet; in the Nineteenth election district 72 votes instead of 69,
as appeared by said tally sheet; and in the Twentieth election district
91 votes instead of 86, as appeared by said tally sheet. It also ap-
pears that the said Howard P. Okie, according to the said tally sheets,
received in the Seventh election district 46 votes for the office of mem-
ber of the board of aldermen, in the Eighth election district 101 votes,
in the Fourteenth election district 116 votes, in the Seventeenth elec-
tion district 43 votes, in the Twentieth election district 160 votes, in
the Twenty-First election district 192 votes, in the Twenty-Seventh
election district 194 votes, in the Twenty-Eighth election district 174
votes; but that, by the original statement of the canvass of the votes
as filed, the inspectors of election certified that the said Okie received
in the Seventh election district, 42 votes instead of 46 votes, as ap-
peared by the said tally sheet; in the Eighth election district, 12
votes instead of 101 votes, as appeared by the said tally sheet; in the
Fourteenth election district 100 votes instead of 116, as appeared by
the said tally sheet; in the Seventeenth election district 38 votes in-
stead of 43, as appeared by the said tally sheet; in the Twentieth
election district 155 votes instead of 160, as appeared by the said
tally sheet; in the Twenty-First election district 190 votes instead of
192, as appeared by the said tally sheet; in the Twenty-Seventh elec-
tion district 190 votes instead of 194, as appeared by the said tally
sheet; and in the Twenty-Eighth 170 votes instead of 174, as ap-
peared by said tally sheet. These facts are not denied; and it ap-
pears that by the action of the inspectors in failing to return the vote

cast for the candidates for these offices, as stated upon the tally sheets, the result of the canvass will be to give Weill and Geagan the offices to which, according to the vote cast, as shown upon the tally sheets, these petitioners were elected.

The question presented is whether, under the law of this state, any relief can be granted to the petitioners under these circumstances, and whether the court has the power to require these officers to perform their duty,—to make a correct statement of the canvass of the vote. If this decision appealed from is correct, it would seem that voting is a useless formality, as it depends upon the will of the inspectors of election as to who shall hold the offices, and not upon the vote of the people. The remedy by quo warranto, or an appeal to the assembly for the office of assemblymen, from the delays incident to such proceedings, would, in the case of an office for such a short term, prevent the person elected from representing the people for the greater portion of the term for which he was elected. The election laws of this state have, within the last few years, undergone the most extensive revision. The question has deeply excited the public interest. As was said by the court of appeals in the case of People v. Board of Canvassers of Onondaga Co., 129 N. Y. 402, 29 N. E. 327, in speaking of the election law of 1890:

"No statute has been passed, in recent years at least, that received such full consideration, or after so much deliberation and careful scrutiny on the part of the executive and the legislature. It was so apparent to every one that it worked such radical changes in the conduct of elections, and in the manner of voting, from the regulations previously existing, that its final passage was secured only after the most exhaustive and careful scrutiny on the part of the lawmakers and the public."

And this is more pertinent as applied to the general election law of 1896, passed as the result of the experience under the law of 1890. It was passed for the purpose of making more effective the safeguards against the abuse of the elective franchise, and rendering more certain the proper and accurate canvass of the votes, and the declaration of the result of an election. It can hardly be thought possible that it was the intention of the legislature to give to inspectors of election the power by a simple certificate to determine the election, regardless of the votes actually cast, and provide no remedy for a mistake or false statement by the inspectors of the votes as actually polled, whether such mistake was intentional or unintentional.

The learned judge who heard this application at special term denied it on the grounds: (1) that an issue of fact was raised as to the correctness of the return, and, as he was prohibited by the Code from passing upon a disputed question of fact upon an application for a peremptory writ of mandamus, there existed "an insuperable obstacle to the success of the relators in these proceedings"; (2) that "neither by virtue of the special provisions of the election law, nor through the exercise of the general statutory and inherent powers which the supreme court possesses, could the relators obtain the relief which they seek through writs of mandamus." The correctness of the second ground upon which the decision was placed must de

pend largely upon the nature of the duties imposed by law upon the inspectors of election. So far as such duties are purely ministerial, involving no act of discretion or judgment, it seems to me clear that the court has the power to enforce obedience to the provisions of the act by mandamus. "A writ of mandamus lies to compel a public officer to perform a duty concerning which he is vested with no discretionary power, and which is either imposed upon him by some express enactment, or necessarily results from the office which he holds." 14 Am. & Eng. Enc. Law, 140, and cases cited in note. In Kendall v. U. S., 12 Pet. 613, it appeared that an act of congress provided that the "postmaster general be, and he hereby is, directed to credit such mail contractors with whatever sum of money, if any," should be awarded to the contractors by the solicitor general. It was held that this credit to the contractors was a mere ministerial act. It was an official act, but there was no room for the exercise of discretion, official or otherwise. All that is shut out by the direct and positive command of the law, and the act required to be done is, in every just sense, a mere ministerial act. A writ of mandamus was proper, therefore, to enforce the performance of such act. In People v. Schiellein, 95 N. Y. 132, it was held that mandamus was proper to require the justices of the peace of a town to meet and canvass the votes cast at a town meeting for the relator for a particular office which it was claimed was vacant. In People v. Bell, 119 N. Y. 176, 23 N. E. 533, it was expressly held that inspectors of election were merely ministerial officers, and that a mandamus was proper to compel them to sign a statement of the votes cast at a general election. In that case it appeared that, after the closing of the polls, the inspectors counted the ballots which had been cast, and that the result of the count had been proclaimed; but the inspectors of election refused to sign the return containing a statement of the result of the vote as required by law, on the ground that fraudulent and illegal ballots had been received at the election, and placed in the ballot box, without the consent or action of a majority of the inspectors. It was held that it was the duty of the inspectors to sign the return; that they were merely ministerial officers to execute the law in a prescribed and definite way; that all votes cast must be counted and returned, and the signature of every inspector to the certificate containing the statement required by the law was obligatory upon him. See, also, People v. Wilson, 119 N. Y. 515, 23 N. E. 1064; People v. Board of Co. Canvassers of Onondaga Co., 129 N. Y. 445, 29 N. E. 327; People v. Wood, 148 N. Y. 147, 42 N. E. 536.

So far as the inspectors of election are by the election law required to perform a particular act, in its nature ministerial, not requiring the exercise of discretion or judgment, these authorities establish that they may be required as prescribed by law to act by mandamus. What, then, is the nature of the duty imposed upon these inspectors of election by the general election law of the state relating to the original statement of the vote cast at an election which they are required by law to make? The enactment of the

general election law of 1896 was the result of a popular demand for
a reform of the law respecting elections, and the result of the expe-
rience of the working of the several amendments to the law which
have been passed in late years, and which have materially changed
the system of voting in this state.    The main object of the new law
was to change the system from a ballot prepared by the individual
voter, which represented his. wishes as to the public officers to be
elected, to a ballot prepared by the state, containing the names of all
those who were candidates; the voter to indicate by a mark those
for whom he wished to vote.    With this change, a new and some-
what different method of counting the votes, and certifying the result
of such count to the boards of canvassers of the several counties, was
adopted.    Under the old law the method of counting was not par-
ticularly prescribed, but the new law is much more particular in
this respect.    An examination of its provisions will show that most
minute particulars are prescribed as to the count of the vote, the
record to be kept of that count as it proceeded, the publicity to be
given of the result as soon as ascertained, and the certification of that
result to the officers upon whom was imposed the duty of preserving
such records for the final canvass of the vote.    It was the evident
intention of the lawmakers to preserve, from the moment the canvass
of the vote commenced, a complete record of the acts of the election
officers; so that through the whole canvass, until the result was
finally announced, there could be a record of their proceedings.

The act is chapter 6 of the general laws of the state, being chapter
909 of the Laws of 1896.    After providing for the form of the ballot
and its preparation by public officials, section 84 of the act provides
that "the officers charged with the duty of furnishing the official bal-
lots shall furnish to the board of inspectors of each election district
two tally sheet blanks, three ballot return sheet blanks, three elec-
tion return sheet blanks, three blanks for the report of assisted and
challenged electors, which shall be delivered to such board of in-
spectors as elsewhere provided."    The form of the tally sheet blanks
is then prescribed, and directions for the canvass of the votes, and
how it shall be recorded, are given.    Space upon this ballot sheet
blank is provided for the entry of the vote cast for each person who
is a candidate at the election.    There is one column for the straight
ballots, which would be the same, of course, for each candidate upon
a ticket.    There is then a blank for the number of votes cast and
counted for each candidate on split ballots, and then a column for
the total number of votes cast and counted for each candidate.    There
is also a separate space for the total number of ballots not wholly
blank, on which no vote was counted for the candidates mentioned;
a space for the total number of wholly blank ballots; a space for the
total number of void ballots; and also a space for the total number
of ballots accounted for.    It is expressly provided that by adding
together the votes cast for all the candidates for a particular office,
together with the number of ballots on which no vote was cast for
that office, and the number of wholly blank and void ballots on which
no vote was counted for any office, the total should equal the total

number of ballots voted, and that, unless it does, the count of the votes and ballots is wrong, and they should be recounted. In the provision regulating the use of this tally sheet, in section 84 of the act, the officer who is to keep this ballot sheet is stated to be the poll clerk. He is also required to enter upon this ballot sheet the name, and the votes therefor, of a person voted for whose name is not printed on the ballot; and it is provided that the method of counting the vote shall be as provided in section 110 of the act. In the sample tally sheet which is a part of the section is shown the way in which it is to be used, and this clearly indicates that the tally sheet is to be used to keep a record of the votes as they are counted. , Section 110, subd. 3, provides that the straight ballots shall be separated from the split ballots and counted, and the number of straight party votes for each candidate shall be entered in gross opposite his name on each tally sheet by each poll clerk; that the chairman of the board shall then take the split ballots separately, and announce the votes for each candidate in the order of the office printed thereon, and each poll clerk shall make an accurate tally of the same; that the poll clerk shall then add together all the votes for each candidate, and the ballots wholly blank and void, together with the ballots on which no votes were counted for any candidate for such office, and shall enter the total thereof in the proper column on the tally sheet. As soon as the count is completed for each office, the poll clerks shall submit the result to the inspectors for examination, and, if found to be correct, the chairman shall at once announce the result.

We have here the detailed instruction for counting the votes, and by section 111 this is designated as the "canvass." It is clear from the provisions before cited that this canvass, as specified in section 111 of the act, includes not only the counting of the vote by the inspectors, but the record of the count by the poll clerks upon the tally sheet. This tally sheet, therefore, is made a substantial part of the canvass. It is the official record of the count as it progresses; and, upon the completion of the count and the verification of the tally sheet, what there appears is the result of the canvass, which is to be announced as the vote of the election district. The provision is imperative that, if the number of votes and uncounted ballots and the total ballots voted do not agree, the ballots must be recounted until the record kept by the poll clerks upon this tally sheet does agree with the number of ballots voted. Then, by the same subdivision 3 of section 110, it is provided:

"That in cities of the first class the chairman of the board of inspectors shall, forthwith upon the completion of the count of the votes for each office, respectively, and upon the announcement thereof, deliver to the police officer on duty at such place of canvass a statement subscribed by the board of inspectors, stating the number of votes received by each candidate for such office. Such statements shall forthwith be conveyed by the said officer to the station house of the police precinct in which such place of canvass is located, and he shall deliver the same inviolate to the officer in command thereof, who shall immediately transmit by telegraph, telephone or messenger, the contents of such statement to the officer commanding the police department of such city. Such statement shall be preserved for six months by the police, and shall be presumptive evidence of the result of such canvass for each such office."

Here we have detailed instruction to the election officers as to how the vote is to be counted. The inspectors are to count, the poll clerks to keep a record upon the tally sheets of such count as it progresses, the number of votes for each candidate to be ascertained by the poll clerks, and entered on the tally sheet, which is to be verified by the inspectors, a public announcement to be at once made of the result, with a statement of that result given to the police officer, to be transmitted to the chief police officer of the city, and by him preserved. This statement, thus made, immediately upon the completion of the count, is to be presumptive evidence of the result of the election in such particular district. Upon the completion of that count, the ascertainment of the total vote by the poll clerks upon the tally sheet, the verification of the tally sheet by the inspectors, and the announcement by the inspectors of the result, the canvass is completed. What happens after relates to the duties of the election officers in certifying that result thus announced from the tally sheet as thus kept and prepared, and is merely ministerial. The result thus announced must comply with the tally sheet as kept by the poll clerks, the correctness of which has been verified by the inspector; and, until the correctness of the tally sheet is ascertained, the statute explicitly provides that the count is not complete,—the votes have not yet been canvassed. When the record of the count upon the tally sheet has been completed by the ascertainment of the total vote cast for each officer, and the correctness of the additions ascertained, the canvass is complete. Then the public announcement of that canvass must be made, and nothing remains to be done but to make the formal official statement of the completed canvass, the record of which has been duly made and announced for transmission to the proper authorities. This official statement of the canvass is provided for in section 111 of the act. It is there provided that, upon the completion of the canvass, the board of electors shall make and sign an original statement thereof. The making of this original statement of the canvass is clearly a ministerial act, and the statement is clearly to contain the result thus announced, as appears upon the tally sheet kept and verified as prescribed by the act. No discretion is then vested in the inspectors as to what that statement shall contain. The provision is explicit that in that statement shall be the number of the election district, the town or ward, and the city and county, in which it was held, on the first page or pages of which there shall be return of the ballots voted, following which there shall be a separate return for each office of the votes cast for each candidate therefor in the form prescribed for such returns and statement in section 84 of the act.

It is perfectly plain that the return that was to be made by this statement was a return of the votes as cast and counted and recorded in the tally sheet; and no election officer was authorized to vary in the slightest degree from the vote as thus ascertained and counted and recorded. The statute having provided thus particularly as to the keeping of the tally sheets, provided officers whose duty it is to keep them as the records of the vote as counted, having provided for a verification of the record contained in these tally sheets by the

inspectors, it was clearly the intention of the legislature to prescribe that the statement of the canvass should contain the votes as recorded in these tally sheets. No officer was then at liberty to deviate from the result as shown by the tally sheets, and as announced as the result of the vote in the particular district. It was the duty of these inspectors to transcribe from these tally sheets, upon the official statement of the vote, the totals appearing in the tally sheet as the vote of the district. No other source exists from which a statement could be made. No recount of the ballots by the inspectors after the announcement of the vote was authorized. The official statement was certainly not to be made from the recollections of the inspectors of the vote as they had counted it; and there is provision for the keeping of no other record of the vote, except the record contained upon these tally sheets. The necessity of the situation requires that the tally sheet should be the source from which the inspectors are to make up the statement required by section 111 of the act. Their duty, as there prescribed, is to make the statement the result of which they have announced from the tally sheet, and to make it in strict accordance with the totals contained upon the tally sheet; and having made these statements, and having transmitted them to the public officer specified, their duty is performed. We have, then, the further provision of the statute that these tally sheets are to be preserved, one of which is to be filed with the board of police commissioners, and one to be filed with the county clerk, and to be preserved for six months after the election. That the action of the inspectors in making this statement of the vote is ministerial, and that mandamus is proper to compel them to perform this duty, is sustained by reasoning in People v. Bell, 119 N. Y. 175, 23 N. E. 533.

It is in this case stated upon oath that the official statements made by the inspectors do not correspond with the public record of the vote as contained in the tally sheet. What is the reply that these inspectors present to the court when charged with this violation of their plain duty of making a return which contains the result as contained in the tally sheet? They say, "if there is any discrepancy between the said returns and the tally sheets, that the error is not in said returns, but in said tally sheets; that the returns were carefully prepared at the time when the counting of the votes was completed, and the number of votes given to each candidate was put down at the time that the count was completed, in the presence of all of the officers of election, and of the various watchers representing the different political parties." No reason is given why the tally sheet, the cotemporaneous record of the count, is incorrect. But, as we have seen, it was the duty of the inspectors to state the vote, not as they recollected it from the count, not as they wished it to be, not as they thought it necessary for the benefit of any individual candidate that it should be, but as it appeared upon the tally sheet kept as prescribed by law. There is no denial of the express allegation of the petitioners that the vote as returned on the statement is different from that shown upon the tally sheet. The case is thus presented without dispute as to the material fact that these inspectors, bound by law to make a statement containing the result of the can-

vass as shown upon this tally sheet, have failed to make such a statement. Thus, there is no dispute of fact. The fact stands substantially conceded that these inspectors have failed to perform the ministerial act which the statute required them to perform, namely, to make out a statement of the votes as shown by the tally sheet, kept as prescribed by law. This was clearly a clerical error. It was an error in transcribing the vote from the tally sheet to the return. The canvass of the vote by the county canvasser is prescribed by sections 131 and 132 of the act. By section 131 it is provided that, upon the organization of the board of county canvassers, there shall be delivered to such board all of the original statements, and certified copies thereof, and the sealed packages of void and protested ballots, and the board was required from such original statements and certified copies, and the sealed packages of void and protested ballots, to proceed to canvass the votes cast in such county at such election. By section 132 of the act it is provided that if, upon proceeding to canvass such votes, "it shall clearly appear to any county board of canvassers that certain matters are omitted from any such statement or copy, which should have been inserted, or that any merely clerical mistakes exist therein, they shall have power, and such power is hereby given, to summon the inspectors of election whose names are subscribed thereto before such board, and such inspectors shall forthwith meet, and make such corrections as the facts of the case require." The facts of the case, as shown here, are directly within the provisions of this section. There was here clearly a clerical mistake in transcribing the number of votes in these election districts for the several candidates for the offices above named. The statement, as we have seen, was to be the vote as shown upon the tally sheet. The vote as contained in the statement was an entirely different vote from that recorded in the tally sheet, and there was thus a clerical mistake. "Clerical" is defined by the Century Dictionary to be "relating or pertaining to a clerk or copyist, as, a clerical mistake.". "Clerical error" is defined in the Imperial Dictionary to be "errors made by a clerk or by a transcriber," and in the Standard Dictionary "a mistake in copying or writing."

We think that, when it appeared before the board of county canvassers that the original and certified copy of the statements submitted by the inspectors of election certified to a different number of votes from that contained in the tally sheet, it was apparent that a clerical mistake existed therein; that it was the duty of the board of county canvassers to require the attendance of the inspectors before them for the purpose of correcting such clerical mistake; and that, upon the assembling of the inspectors before the board, it was clearly the duty of the inspectors to forthwith make such corrections "as the facts of the case required," viz. a correction in their statements conforming them to the official records contained in the tally sheets as the result of the election. We think, therefore, that the court below should have granted the motion, and required the board of county canvassers to summon before it the inspectors of election from the district named, and require such inspectors to forthwith amend their return so as to correct the clerical mistake, and cause their canvass to

be correctly stated, viz. by inserting in the statement as prepared by them the result as it appears by the tally sheet kept as prescribed by law.

The orders appealed from are therefore reversed, and motions granted.

BARRETT, RUMSEY, and O'BRIEN, JJ., concur.

VAN BRUNT, P. J. I dissent. I do not think that the tally sheets necessarily control. They are evidence, but do not necesarily control the returns.